United States District Court
Southern District of Texas
**ENTERED**
November 09, 2021
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| RICHARD RILEY, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-19-2734 |
| | § | |
| SHELL CHEMICAL L.P., | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM & ORDER**

Pending before the court is Shell Chemical L.P.'s ("Shell") motion for summary judgment. Dkt. 15.  Having considered the motion, response, reply, and applicable law, the court is of the opinion that Shell's motion should be **GRANTED**.

**BACKGROUND**

This is an employment discrimination case.  Plaintiff Richard Riley ("Riley") worked for Shell at its Norco Manufacturing Complex (the "Norco Complex") in Norco, Louisiana from August 2013 through February 2019.  Dkt. 15, Ex. 2 at 3.  During his tenure with Shell, Riley alleges three instances of racial harassment that he claims created a hostile work environment in violation of Title VII, 42 U.S.C. § 2000e-2(a), and Louisiana's anti-employment discrimination law, La. Rev. Stat. 23:332.  Dkt. 1, Ex. 1 at 14.

Riley worked as an operator in the Norco Complex's Olefins Unit, helping Shell manufacture different chemical products by maintaining its furnace systems.  *Id.* at 3–4.  Because the Norco Complex operated twenty-four hours a day, seven days a week, Dkt. 15 at 9, Shell relied on different units of its approximately one thousand workers to staff the facility in twelve-hour shifts.  Dkts. 15, Ex. 2 at 3–5, 19, Ex. 1 at 12.  Riley worked for the "OL-5 Unit," which consisted

of himself and several other employees.  *Id.* at 4.  Riley is African American and many of his former colleagues are white.  *See* Dkt. 15, Ex. 2 at 12.

### A.  The 2014 Noose and Graffiti

On the afternoon of January 31, 2014, an employee—not Riley—discovered a rope hanging in one of the Norco Complex's units.  Dkts. 19, Ex. 1 at 20, 15, Ex. 2 at 18.  The rope was tied in a hangman's knot and resembled a noose.  Riley never saw the noose but had heard of it from other employees.  Dkt. 15, Ex. 2 at 18–19.  Someone, however, reported the noose to Shell's human resources department.  Dkt. 15, Ex. 1 at 62.  A human resources manager, a production unit manager, and the security manager all visited the site.  *Id.*  Those individuals secured the area, took pictures of the noose, and removed it.  *Id.*  They then placed the rope in a security vault.  *Id.*  Later, "[a] note was sent out to the refining and chemical site notifying employees of the incident and reassuring them that the Company takes [this incident] seriously and an investigation would take place."  *Id.* at 62.  That "note" came in the form of an e-mail that notified Norco Complex employees of the "rope…that was tied in a knot similar to a noose" and soliciting their cooperation in the investigation.  *Id.* at 65.  The e-mail advised employees that Shell had a "zero tolerance policy for any incidents of workplace violence, including threats of violence or any form of harassment."  *Id.*  The e-mail continued:

> If it is determined that any Shell…employees were involved, disciplinary action, up to and including termination, will be taken against those who are found responsible.  If it is determined that any contractor employees were involved, they will be banned from the Norco Manufacturing Complex premises indefinitely and their employer will be notified of their involvement.  Additionally, criminal charges may also be filed if appropriate.

*Id.* at 65.

Shell continued its investigation by interviewing the individuals who found the rope.  *Id.* at 62. Those individuals reportedly told Shell's security manager that "they didn't believe that the

incident was targeted towards them specifically." *Id.*  The security manager then contacted his counterpart at the Port Arthur refinery "to determine if they ha[d] seen similar issues at their site." *Id.*  They had but determined that the "similar nooses…were…innocent and directly related to tradesmen's work." *Id.*  The security manager subsequently spoke to one of the craftsmen on the Norco site "who revealed that tradesmen frequently tie nooses in rope in order to raise and lower materials" and that it was "not unusual for craftsmen to practice tying knots during breaks, including knots like the one found [at the Norco Complex]." *Id.*

Shell's investigation continued into February 3, 2021, when a human resources manager and the security manager made a field visit. *Id.*  During their field visit, they observed "numerous ropes hanging in the piperack very near the one reported." *Id.*  Four additional ropes were found, "all with some sort of slip loop knot tied in them that from a distance would look similar" to the reported noose. *Id.*  The next day, the human resources manager met with a refinery turnaround coordinator to discuss the kind of work performed where the noose was located. *Id.*  During that conversation, the human resources manager learned that "there was a lot of work associated with…[an]...upgrade project that took place in th[e] area, several new valves were installed, new insulation [was] installed, flanges…had been opened for blinding, [and]…piping inspection work…took place in th[e] area." *Id.*  Scaffolding was necessary to support this work and this, in turn, required the craftsmen to "use ropes to raise and lower tools/equipment to the jobsite due to the congestion in th[e] area" and limited access to a crane. *Id.*  Based in part on this information, Shell's human resources department concluded that the rope was tied for work-related use. *Id.* at 63.

Despite concluding that the noose was work-related, Shell issued a prohibition against the use of the "hangman's noose knot" by March of 2014. *Id.* at 67.  In its policy proclamation, Shell

explained that the "hangman's noose knot is construed by many as offensive and is therefore not aligned with our Core Values (Honesty, Integrity, and Respect for People) or commitment to a harassment free workplace." *Id.* To that end, Shell announced that "[f]urther use or display of these knots will not be tolerated and disciplinary action up to an including termination of employment will be taken against those responsible." *Id.*

A few weeks later, on February 22, 2016, when he was servicing a furnace, Riley found "a drawing of a head and profile" with the "N word" above it. *Id.* at 8. An arrow connected the slur to the drawing. *Id.* Though Riley performed daily operation rounds in the area that he found the graffiti, he had not previously noticed the drawing and did not know when it appeared. *Id.* Riley reported the drawing to Shell's human resources department. *Id.* Shell spoke with Riley about the graffiti and painted over it. *Id.* As it did with the noose, Shell sent out an e-mail to the Norco Complex employees notifying them of "an inappropriate caricature and racial slur…found written on the wall of a furnace" in the OL-5 unit. *Id.* at 22. Shell reiterated that it had a "zero tolerance policy of any form of harassment, by or against personnel that work here or other individuals on site." *Id.*

In investigating the caricature, Shell documented that "Team Leaders will be having conversations with each operator in the OL-5 Unit to share what was found and remind them of [the company's] harassment policy. They will ask each individual if they know anything that could help us find who did the drawing." *Id.* at 19. Riley did not see another display of inappropriate graffiti in the area after making his report. *Id.* at 8–9.

**B. The 2016 Recording**

In October of 2016, shortly before the presidential election, Riley was beginning his shift with four of his fellow crewmates, all of whom were white. *See id.* at 10. While Riley skimmed

his e-mail, his colleagues discussed politics.  *Id.*  Riley asserts that he felt as if his supervisor was

trying to "bait [him] into a conversation" that would reveal his political leanings.  *Id.*  Riley got

the impression that his colleagues supported then-candidate Donald Trump and "didn't like Hillary

Clinton."  *Id.*  While Riley was present, no one used any racial slurs.  *Id.*

 Riley left.  *Id.*  But before leaving, he set his phone to record and left it behind to capture

his colleagues' conversation.  *Id.* at 10–11.  He did so because, based on "what [he] was hearing,

[he] just felt like there was more to be said if [he] wasn't in the room, because [he] was the only

black person in the room at that time."  *Id.*  Riley did not obtain his colleagues' consent before

recording the remaining forty-to-forty-five minutes of their conversation.  *Id.* at 11.  When he later

listened to the recording, he "learned that a couple of [his] co-workers didn't care for black

people."  *Id.*  Riley arrived at that assessment because, in his absence, his colleagues complained

about several of their African American peers, calling them "lazy" and "stupid."  *Id.* at 11, 28.

Riley acknowledged that his colleagues never deployed any racial slurs but all the people they

criticized were African Americans.  *Id.*  The group apparently reserved special criticism for another

shift in the Olefins Unit that was comprised mostly of African American workers.  *Id.* at 12.

Riley's colleagues allegedly deemed that shift the "Black shift," and discussed "how they needed

to pull one of the white guys off…because it was going to make him look bad working on [the]

shift."  *Id.*

 Riley's supervisor also disclosed to the unit crew that he had previously denied Riley's

request to briefly leave work to help his fiancé open her car.  In Riley's telling:

> [W]hen I first got hired, during my training…I needed some attention at my house
> and I came to [the supervisor] about it and asked his help, because he was the
> supervisor at the time, and I let him know that I needed to possibly go home, just
> for about ten minutes or so, because I only live about five minutes away from the
> plant, and so he told me no, that I couldn't go home, and this was I think it was in
> 2014 or 2015, I can't remember, but he didn't allow me to go home at that time and

he disclosed all this information to them while they were sitting at the—while they were sitting there talking.

*Id.*  Riley reported this exchange to Shell's human resources department and sought to transfer from the Norco Complex.  Dkt. 15, Ex. 1 at 25.  Once more, Shell investigated Riley's claims, interviewing all involved and drafting an investigative report.  *See id.*  Shell issued a "Written Reminder" to Riley's supervisor "for sharing a personal issue that [Riley] had brought forward to him" with his colleagues and "for allowing the operators to talk poorly in a non-conducive manner regarding the performance of their co-workers and fellow team lead."  *Id.* at 31.  In addition, Shell's human resources investigator recommended counseling Riley's supervisor "on the difference between allowing operators to vent and allowing operators to talk negatively about co-workers and team leads" and on his "unique role as [an] agent of the company."  *Id.*  The human resources department likewise recommended that the company "[r]emind Operators across production that discussion regarding polarizing topics that have the potential to become heated should not take place in the workplace."  *Id.*  Finally, the human resources department recommended addressing "potential underlying racial issues" through a sensitivity and professional behaviors training to take place during the first quarter of 2017.  *Id.*  A human resources manager confirmed that the recommended counseling and training occurred following Riley's report.  Dkt. 15, Ex. 3 at 11.

### C.  The 2018 Drawing of a Person Being Lynched Found in Riley's Locker

On May 4, 2018, Riley returned to work after a two-week vacation.  Dkt. 15, Ex. 1 at 44. As was his practice, he went to the locker room.  When he opened his locker, he found a drawing of a man hanging from a noose.  Dkt. 15, Ex. 1 at 44.  Riley notified his supervisor and security. During his interview with human resources and security personnel, which took place later that day, Riley commented that the drawing was "of a person with big ears and glasses.  I have big ears and wear glasses.  That resembled me."  *Id.*

Riley also reported in the interview that he did not feel safe at work. *Id.* at 45. In addition to being on the receiving end of blatantly racist imagery, Riley stated that "[s]mall things like valves may be mysteriously left opened or things might not be lined up as they should. I also don't know what can happen outside these gates." *Id.* He continued:

> I feel like this is a direct threat to my life, that picture means you want me dead. I don't know if people are joking or trying to scare me. I had to share this with my fiancé because this is a pattern. Now she is crying and not feeling safe. I have five children at home. I should not have to feel like this.

*Id.* Riley reiterated his desire to transfer from the Norco Complex. Dkt. 15, Ex. 2 at 18. For its part, the human resources department recommended that the company offer to move Riley to another operator unit via a process known as secondary vacancy. Dkt. 15, Ex. 1 at 47. In addition, the human resources department recommended that "HR & Management…conduct an expectation setting meeting on core values and the zero tolerance" policy. *Id.* Shell also contacted the FBI. Dkts. 15, Ex. 2 at 26, 15, Ex. 3 at 7. Evidently, the FBI did not conduct any follow-up investigation. Dkt. 15, Ex. 3 at 14–15. The culprit was never identified. *See* Dkt. 15, Ex. 1 at 47.

### D. Riley's Transfer Requests and Leaving Shell

Following the 2016 recording, Riley requested a transfer to a different facility.[1] Dkt. 15, Ex. 2 at 19. The Norco Complex had a rule that employees could not transfer to another facility prior to completing five years with the company. *Id.* at 22. Having started his tenure with Shell in 2013, Riley was not yet eligible for a transfer from the Norco Complex. *See id.* Instead, Shell offered to transfer Riley to DU-5, the Norco Complex's distilling unit. Dkt. 15, Ex. 3 at 27, Ex. 5 at 3.

---

[1]     Riley took a six-month leave of absence following the 2016 recording incident. Dkt. 15, Ex. 2 at 19. He returned to work in May 2017 and worked without incident until April 2018. *Id.* However, during that period, Riley contends that he received negative evaluations from a new supervisor that would affect his ability to transfer from the Norco Complex once he satisfied Shell's five-year criterion. *Id.* Riley's new supervisor was also African American. Id. at 23.

The DU-5 unit was not Riley's first choice of transfer destinations.  Dkt. 15, Ex. 2 at 23.  Despite this, Riley accepted the transfer.  *Id.*  Per the terms of Riley's contract, his pay would stay the same in the DU-5 unit.  *Id.*  However, Riley was ineligible for overtime in the DU-5 unit.  *Id.*  He would also need to be trained and certified to be qualified to work in the unit.  *Id.*  And the seniority he accrued in the OL-5 unit, which would determine his eligibility for a raise, would be erased.  Dkt. 15, Ex. 3 at 13.  One day before his start date in DU-5, Riley notified management that he had changed his mind that asked to stay in OL-5.  Dkt. 15, Ex. 2 at 23.  Shell would not permit Riley to return to OL-5 because his old position was apparently no longer available.  *See id.*  So, Riley started working in the DU-5 unit on June 17, 2018.  *Id.* at 24.

A couple of weeks later, on July 5, 2018, Riley applied for a process technician position in Gregory, Texas with Exxon.  *Id.*  He interviewed for the position on August 23, 2018.  *Id.*  Exxon offered Riley the position on September 28, 2018, with a 2019 start date.  *Id.*  Riley submitted his letter of resignation on January 14, 2019.  *Id.* at 25.

On November 20, 2018—after being offered a position with Exxon, but before resigning from Shell—Riley filed a charge of discrimination and retaliation against Shell with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Louisiana Commission on Human Rights ("LCHR").  Dkt. 1, Ex. 1 at 9.  The EEOC issued Riley a "Right to Sue" letter on March 20, 2019.  *Id.*  Riley then filed his complaint alleging racial discrimination, retaliation, and a hostile work environment on June 17, 2020 in Texas state court.  *Id.* at 8.

### STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Shepherd, on Behalf of Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019).  "A fact

8

is material if it would affect the outcome of the case" and "a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Warren v. Fed. Nat'l Mortg. Ass'n*, 932 F.3d 378, 882–83 (5th Cir. 2019) (quotation marks omitted).

A court considering a motion for summary judgment must view "all evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in the non-movant's favor." *Hutcheson v. Dallas Cnty.*, 994 F.3d 477, 479 (5th Cir. 2021). "However, to avoid summary judgment, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007). The non-movant must "make a sufficient showing of an essential element of the case to which [he] has the burden of proof." *Melton v. Teachers Ins. & Annuity Ass'n of Am.*, 114 F.3d 557, 559 (5th Cir. 1997). Rule 56 does not impose a duty on the court "to 'sift through the record in search of evidence to support' the non-movant's opposition to summary judgment." *Carr v. Air Line Pilots Ass'n Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)). Conclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

### DISCUSSION

### A.    Riley's Discrimination and Retaliation Claims

The Fifth Circuit "has consistently held that arguments not raised in response to a motion for summary judgment are waived." *Hensley v. Wal-Mart Stores Inc.*, 290 F. App'x 742, 743 (5th Cir. 2008); *see also* S.D. Tex. L.R. 7.4 ("Failure to respond will be taken as a representation of no opposition."). That is because "[o]vercoming summary judgment 'requires the nonmoving party to go beyond the pleadings and by h[is] own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there is a genuine [dispute] for trial.'" *Williams v. Tarrant Cty. Coll. Dist.*, 717 F. App'x 440, 448 (5th Cir. 2018) (quoting *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001)).

At the outset, the court notes that it is unclear whether Riley advances claims of discrimination, retaliation, *and* a hostile work environment or *just* a hostile work environment claim. On the one hand, Riley styles his causes of action in his complaint as "race discrimination and retaliation (hostile work environment)." Dkt. 1, Ex. 1 at 14. He alleges, in relevant part, that he "was subjected to harassment by [Shell's] agents and employees as a result of his African American origin, including being exposed to racial slurs and racist graphics that were directed at Plaintiff and other African American employees." *Id.* On the other, Riley does not respond to Shell's contention in its motion for summary judgment that he is time-barred from bringing distinct discrimination and retaliation claims that predate January 24, 2018. *See generally* Dkt. 19. Nor, for that matter, does Riley argue in his six-page response to Shell's motion that the 2018 lynching picture hung in his locker constitutes a discrete instance of racial discrimination. *See id.* In any event, Riley's complete failure to respond to Shell's arguments regarding his standalone discrimination and retaliation claims compels the court to find that he has waived these claims.

But even if Riley had responded, the court cannot consider those actions predating January 24, 2018 as discrete instances of harassment for the purposes of establishing liability because he did not timely raise them to the EEOC. Title VII provides, in relevant part, that a charge of unlawful employment practices "shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C.A. § 2000e-5. With respect to discrimination and retaliation claims, "only incidents that took place within the

timely filing period are actionable." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061 (2002).[2]

Unlike discrimination and retaliation claims, which revolve around discrete acts, hostile work environment allegations are often predicated on wrongful acts occurring "over a series of days or perhaps years." *Id.* at 115.  By themselves, those acts may not constitute actionable harassment claims.  *Id.*  But the "cumulative effect of individual acts" dispersed across a wide swath of time can make for a viable hostile work environment action.  *Id.*  For that reason, the Supreme Court has held that courts may consider acts predating the 300-day period for the purposes of establishing liability in a hostile work environment suit.  *Id.*  Nevertheless, for standard discrimination and retaliation claims, the 300-day period applies.  *See id.*

Riley filed his discrimination and retaliation charges with the EEOC on November 20, 2018.  Dkt. 1, Ex. 1 at 9.  Therefore, for the purposes of Riley's ostensible discrimination and retaliation claims, the court may not consider any allegedly unlawful acts prior to January 24, 2018 for the purposes of liability.  Thus, the statute of limitations bars the court's consideration of the 2014 noose and graffiti, and the 2016 recorded conversation, as discrete instances of racial harassment.

The May 4, 2018 discovery of the lynching drawing is the only allegation of racial harassment that is not time barred.  Yet, even if he had not waived it, Riley does not show any genuine dispute of material fact with respect to whether the drawing constitutes an individual instance of discrimination.  To establish a prima facie case of racial discrimination under Title VII,

---

[2]    Analysis of employment discrimination claims under Louisiana law is coextensive with federal employment discrimination caselaw.  *Baker v. FedEx Ground Package Sys., Inc.*, 278 F. App'x 322, 327 (5th Cir. 2008) ("We look to federal employment discrimination jurisprudence when interpreting Louisiana's anti-discrimination laws." (citing *Smith v. Amedisys, Inc.*, 298 F.3d 434, 448 (5th Cir. 2002)).

Riley is required to show: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) others similarly situated but outside the protected class were treated more favorably. *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007). Riley at no point identifies a similarly situated comparator in his briefing and the court is not obligated "to sift through the record in search of" one to support Riley's case. *See Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

### B. Riley's Hostile Work Environment Claim

A hostile work environment exists when the "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367 (1993) (cleaned up). To establish a claim of hostile work environment, a plaintiff must prove he (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on his membership in the protected group; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). The first three elements of the claim are easily established; Riley is African American and the drawing of a lynched man resembling him that was placed in his locker makes clear he was harassed based on his race. The parties contest only whether Riley suffered an adverse employment action and whether Shell failed to take prompt remedial action. Riley fails to show a genuine dispute of material fact with respect to the latter. Because "[s]ummary judgment is appropriate if the plaintiff cannot support all…elements," the court makes no ruling on whether Riley has shown a factual dispute as to whether he suffered an adverse employment action.

Shell may "avoid Title VII liability when harassment occurred if [it] took 'prompt remedial action' to protect the claimant." *See Williams-Boldware v. Denton Cty., Tex.*, 741 F.3d 635, 640 (5th Cir. 2014). This inquiry is "fact-specific" and "not every response by an employer will be sufficient to absolve the employer of liability under Title VII." *Id.* (internal quotation marks omitted). Sometimes, "an employer may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not reasonably calculated to halt the harassment." *Hockman*, 407 F.3d at 329. (citation and internal quotation marks omitted). But other times, an employer's responsive actions constitute "prompt remedial action as a matter of law." *See Williams-Boldware*, 741 F.3d at 640.

Riley argues that "Shell failed to identify a single investigation that addressed the pervasive racial harassment at the Norco Facility; that is because there was never an investigation that identified a wrongdoer." Dkt. 19 at 5. He further contends that "Shell's investigations were, at best, lacking, and, at worst, permissive of the admittedly hostile and racist activity that was prevalent at the Norco Facility." *Id.* Regarding its investigation into the 2018 drawing, Riley concludes that Shell conducted "an investigation in name only." *Id.* at 6. But Riley points to no evidence in the record supporting this conclusion, other than the undisputed fact that Shell did not identify the culprit.

However, finding the culprit behind racially noxious harassment is not a necessary condition for an employer's actions to be prompt and remedial. *See Hirras v. Nat'l R.R. Passenger Corp.*, 95 F.3d 396, 400 (5th Cir. 1996) (per curiam) (holding that employer took prompt remedial action when it took employee's "complaints seriously and conducted a prompt, thorough investigation," despite not identifying perpetrator of harassment). So, Riley's suggestion that

13

"address[ing]" racial harassment requires "identif[ying] a wrongdoer" fails as a matter of law. *See id.*

In the absence of any factual argument from Riley is a groundswell of uncontested evidence regarding Shell's investigations. Consider the investigation Shell launched immediately after Riley reported the drawing. Dkt. 15 at 14–16. Personnel from Shell's security and human resources departments interviewed Riley and others the day Riley reported his discovery. *Id.*, Ex. 1 at 44. Because Riley found the drawing the day he returned from vacation, Shell deduced that the drawing was placed in Riley's locker during the nineteen-day period while Riley was off work. *Id.* at 47. But, Shell explains, the lack of any security cameras in the locker room hindered their ability to identify the culprit. *Id.* Shell sent an e-mail to the Norco Complex's employees asking witnesses to come forward, but no one did. Ten days after Riley discovered the drawing, on May 14, 2018, Shell claims its security manager contacted the FBI's New Orleans Field Office to report a potential hate crime, where he was told that the information would be passed to a field agent and was given a reference number. *Id.* at 58. Though a supervisor told Riley that Shell contacted the FBI, Shell does not know if the FBI conducted its own investigation. *See* Dkt. 15, Ex. 2 at 20, Ex. 3 at 14.

Ultimately, though it interviewed multiple people and issued a lengthy investigative report, Shell could not determine who placed the drawing in Riley's locker. Dkt. 15, Ex. 3 at 9–11. Despite this, Shell managers spoke to every employee in the Olefins unit to reiterate the company's zero tolerance policy and inform them that the company would institute a diversity and inclusion training program. *See* Dkt. 15, Ex. 1 at 60. Soon after Riley reported the incident, Shell transferred Riley to another unit. By 2019, Shell had implemented "culture, sensing sessions, [and] engagements with all [its] operators" in the entire state of Louisiana. Dkt. 15, Ex. 3 at 11. Since

14

the May 4, 2018 incident, Shell has not discovered or received reports of other racist caricatures or graffiti at the Norco Complex.

But because Riley mistakenly believes that finding the perpetrator of racist harassment is necessary for a company to take prompt remedial action, he declines to identify the portions of the record that might reflect a genuine dispute of material fact.  *See* Dkt. 19 at 5.  Nor does he argue that, irrespective of whether Shell found the perpetrator, Shell's actions do not qualify as prompt remedial action.  *See id.* at 5–6.  Riley invites the court to do that work for him, asserting that "this Court must look at whether the investigations were, in fact, 'prompt and proper.'"  Dkt. 19 at 5.

However, "[t]he court has no duty to search the record for material fact issues."  *RSR Corp.*, 612 F.3d at 857 (citing *Ragas*, 136 F.3d at 458).  Rather, the obligation to "identify specific evidence in the record and to articulate precisely how this evidence supports his claim" falls on Riley, who, the court notes, is represented by counsel.  *See* Fed. R. Civ. P. 56(c)(1)(a) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by...citing to particular parts of materials in the record.").  And, while Riley explicitly noted in his response to Shell's motion that he "w[ould] not belabor the Court with the standard for summary judgment," Dkt. 19 at 6, that standard is relevant here.  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln General Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  If this burden is met, the nonmovant must then "set forth *specific facts* showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) (emphasis added).  Identifying "specific facts" requires the nonmovant to "go beyond the pleadings," using competent summary judgment evidence showing a genuine issue for trial.  *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 468 (5th Cir. 2010).

In advancing conclusory statements and failing to identify specific facts, Riley abdicates this responsibility.   Accordingly, Shell's motion for summary judgment is GRANTED.

### CONCLUSION

For the reasons outlined above, Shell's motion for summary judgment is GRANTED and Riley's claims are DISMISSED WITH PREJUDICE.

Signed at Houston, Texas on November 9, 2021.

_____
Gray H. Miller
Senior United States District Judge